```
                UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
                      SOUTHERN DIVISION
```

CHARLOTTE DAVIS,

    Plaintiff,

v.                            CV 01-AR-0986-S

BELLSOUTH MOBILITY, LLC,

    Defendant.

## MEMORANDUM OPINION

Before the court is the motion of defendant, BellSouth Mobility, LLC, ("BellSouth"), for summary judgment seeking dismissal of the action brought by plaintiff, Charlotte Davis ("Davis"), for alleged discrimination due to her disability and in retaliation for making complaints about her disability, both pursuant to the Americans with Disability Act ("ADA"), as amended, 42 U.S.C. §§ 12101, et seq. Davis' earlier claims of race and age discrimination have been dismissed.

### Material Facts

Davis began her employment with American Cellular in 1989 as a temporary employee working on budgeting, accounting, and data entry. American Cellular is now BellSouth. On June, 17, 1991, Davis became a full-time employee. In February of 1996, Davis accepted a position as the "Acting" Distribution Sales Associate ("DSA") in Birmingham, Alabama. Davis was eventually made a

full-time DSA.  As a DSA, Davis managed cellular phone sales at thirteen kiosks (retail booths) located in Wal-Mart and Bruno's store in the Birmingham area.  Davis' duties as a DSA included staffing, training, and maintaining the inventory and service for the kiosk locations under her supervision.  While in this position Davis set her own schedule managing the kiosks from her office and her car.  Davis' position as a DSA was eventually eliminated, and she accepted a position working as a Retail Sales Manager at BellSouth's AmSouth Harbert store in October 1997. According to Davis, Rick Rudden ("Rudden") and Henrietta Goodman ("Goodman") were her co-managers until January 1, 1998, when Goodman became Davis' only direct manager and continued to be her boss until she was terminated.  Davis was terminated on December 4, 1998.  Mike Cost ("Cost") was the Director of Sales and Marketing at that time, and as such, he supervised Goodman in her capacity as Branch Manager.  Consequently, Cost indirectly supervised Davis through Goodman.  Davis' duties as Retail Sales Manager included sales, training and supervision of employees, staffing, maintaining service and inventory, preparing reports, and general daily store management.

   During this period, Davis suffered from both internal and external hemorrhoids.  On January 21, 1998, Davis underwent surgery for her hemorrhoid condition, a radical reconstructive hemorrhoidectomy.  She was released from the hospital, post-op

2

day one, in good condition with minimal restrictions, and directions to use a sitz bath twice daily and after each bowel movement. According to her medical records, Davis was expected to make a full recovery within the typical recovery time of around one to two months. Dr. Brian T. Guffin, M.D. ("Guffin"), Davis' treating physician, performed the procedure on January 21 and released Davis with no long-term restrictions and directions to begin a high-fiber diet. (BellSouth Exh. 4). Davis was restricted from driving for the first twenty-four hours, and she was not to lift over five pounds during her recovery period. Guffin testified by affidavit that he expected Davis to make a full recovery and to be able to return to all regular activities, including work, once she recovered from the procedure, which typically occurs within one to two months (Guffin Affidavit).

On March 2, 1998, Davis underwent an outpatient medical procedure to correct an abscessed stitch and simple fistula, complications from her surgery in January. Guffin testified that Davis developed complications from the initial procedure that are relatively common and are fairly simple to correct with a simple additional procedure, which he performed. Guffin testified that after the outpatient procedure, Davis was released the same day with instructions to resume a regular diet and normal activities of daily living. Guffin expected Davis to make a full recovery within two to four weeks, and would be able to return to all

3

regular activities, including work. Guffin advised Davis to resume her normal activities as soon as possible. Other than a brief period when Davis returned to work after her initial surgery, she was on short term disability (STD) from January of 1998 to May 17, 1998. Guffin testified by affidavit that "the only restrictions to return to work for patients who have undergone these procedures is lifting during the period of recovery ... ." (Guffin Affidavit, p. 3, ¶ 13). Guffin did not restrict Davis' work activities because she had not indicated that her job required her to do any lifting, otherwise there were no restrictions on Davis' work activity. The medical records indicate that Davis underwent another minor procedure called a sphincterotomy and anoplasty, on May 1, 1998, which she tolerated well. Davis was released after this procedure with instructions to resume her normal daily activities. (Guffin Affidavit, Exh 7). Davis was scheduled for a follow-up visit with Dr. Guffin on June 8, 1998, but she did not return for further visits until November 4, 1998. (Guffin Affidavit, Exh. 8). According to Guffin, he did not place any restrictions on Davis that would affect her ability to do her job as an office manager, and he is unaware of any reason that would limit her ability to work as an office manager or in an office setting. The only written request by Guffin to BellSouth was that Davis be allowed additional time in the bathroom while working. (Guffin Affidavit, Exh. 9). Guffin

placed no restrictions on Davis' ability to stand, walk, sit at a desk, or drive (except for the 24 hours post-op after her initial surgery). Guffin further testified that he never told Davis that she should be allowed to go home from work to discharge her bowels or clean herself, nor does he know of any medical reason for Davis to do so. (Guffin Affidavit, p. 5, ¶ 26).

Davis contends that her disability, acute hemorrhoids, causes her to be unable to control her bowels. She also maintains that she has difficulty walking, standing, using the restroom, and working. Guffin testified that Davis never complained of difficulty controlling her bowel movements, and that in his opinion, she was not having uncontrollable bowel movements and was not suffering from irritable bowel syndrome. (Guffin Affidavit, p. 4,5). Davis testified that her hemorrhoid condition caused her to lose control of her bowels and bleed, which resulted in her soiling her clothes making it necessary for her to return home. Davis contends that this condition constitutes a disability under the ADA because it has caused her to be "substantially limited" in the "major life activities" of walking, standing, sitting, lifting, eating and drinking, dancing, laughing, coughing, and sneezing. Davis points out that she is "otherwise qualified" because she could perform her job duties with reasonable accommodations. Davis testified that she could not have fixed hours because her condition required

that she be able to go to the bathroom and to clean up whenever her bowels discharged, something that she had to do at home.

Davis maintains that after she returned to work after STD, it was less than a month before Goodman began gathering evidence to justify her termination. BellSouth disputes that it was creating a record to justify Davis' termination, but rather asserts that after she returned to work Davis' performance was poor. In rebuttal Davis argues that the problems she was experiencing for which she received reprimands, including not having scheduled hours, failure to file reports, and problems raised in the audit conducted at the AmSouth Harbert store, all existed prior to her becoming manager of the store. It is her position that other managers, that were similarly situated, were treated differently and were not reprimanded for the similar problems.

BellSouth asserts that it followed a well documented progressive disciplinary procedure before terminating Davis on December 4, 1998. BellSouth maintains that there were the following problems with Davis' work performance: her failure to complete required paperwork and reports in a timely manner; her verbal abusiveness toward employees; her unorganized manner in managing the store, and; her inaccessibility to upper management and her own employees. During the time that Goodman supervised Davis, Davis received at least six memos that reflected these

6

problems. In addition to issuing memos, BellSouth also counseled Davis on her work problems and offered assistance to correct these problems. A final warning was issued on October 7, 1998. On November 4, 1998, Goodman met with Davis and Marilyn Brooks ("Brooks"), a Human Resource representative, and a follow-up memo was issued to Davis even though BellSouth's procedures did not call for an additional warning memo. The issues raised in the memo of November 4, 1998 were Davis' inaccurate paperwork, including inventory reconciles, inaccessibility, appearance of the store, and treatment of her employees.

At the November 4, 1998 meeting, Davis told Brooks and Goodman that the reason she was performing poorly was that she was having medical problems. According to BellSouth, Davis had never before presented any doctor's notes or restrictions of any kind stating that she had any problems performing any job duties. In response to the meeting, Davis provided a note from Guffin indicating that she suffered from "internal and external hemorrhoids," and that she should be allowed enough time to go to the restroom during the day. Guffin did not indicate any further restrictions on Davis' activities. Davis requested additional STD leave, which was granted, but Davis was terminated on December 4, 1998.

### Retaliation

Davis filed an EEOC charge based on her termination. In

that charge, Davis checked the boxes under "Cause of Discrimination Based On" for "age," "race," and "disability," but no box was checked for "retaliation." Davis claims that she was not allowed by the EEOC to check the "retaliation" box because the retaliatory conduct was allegedly out of the appropriate time frame. Davis' EEOC charge nowhere indicates that she was making a claim of retaliation. Davis now contends that BellSouth retaliated against her by making a record of her poor performance, by treating her differently in relation to other managers, and by terminating her. It is Davis' position that other managers were treated differently because they were given time off and flexible schedules, they were not reprimanded or disciplined for conduct similar to the conduct that Davis was disciplined for, and she was terminated whereas they were not. Davis does not describe *per se* any specific complaints that she made to management that might require accommodations for her alleged disability. She never suggested to BellSouth what would constitute a reasonable accommodation in light of her disability. Rather, Davis merely contends that BellSouth's failure to accommodate her requests, when her employer knew about her surgery for hemorrhoids and her medical condition, constitutes a statutorily protected expression. Davis contends that BellSouth's knowledge of the reason for her STD and her request on one occasion to go home to change after having an accident was

8

sufficient to put BellSouth on notice that she was disabled, and that she was requesting accommodations for her disability. Davis argues that BellSouth had ample reason to believe the ADA was being violated because of her requests to BellSouth that she was not receiving flexible hours and her suggestion that she needed work more suited to her health needs. In other words, Davis argues that BellSouth's failure to accommodate her needs is an adverse reaction to protected activity under the opposition clause.

## Analysis

The ADA prohibits discrimination on account of a disability in terms of conditions and privileges of employment against qualified individuals. The Eleventh Circuit follows the familiar shifting burden analysis of Title VII in ADA cases. Under this analysis, Davis must first establish a *prima facie* case of discrimination on account of her disability. In order to accomplish this Davis must show 1) she has a disability, 2) she is a 'qualified individual,' which is to say that she is able to perform the essential functions of the position that she held, with or without reasonable accommodation, and 3) BellSouth unlawfully discriminated against her because of the disability. *See generally Reed v. The Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000). Davis has not established a *prima facie* case of discrimination because she has failed to show that she was

9

disabled within the meaning of the ADA.

In order to prove the first element of her *prima facie* case, that she is disabled under the ADA, Davis must show that: 1) she has a physical impairment that *substantially limits* one or more of her *major life activities* of such individual; 2) that there is a record of such an impairment; or 3) she is regarded as having such an impairment. *See Toyota Motor Mfg., Inc. v. Williams*, 122 S.Ct. 681, 690 (2002); *Albertson's, Inc. v. Kirkingburg*, 119 S. Ct. 2162 (1999).

In order to prove a disability under the ADA, Davis must demonstrate that she is not merely impaired, but that her impairment "substantially" limits a major life activity. Davis has not proven that she is "substantially" limited in any life function. The record evidence indicates that Davis was not and is not severely restricted or prevented from doing any activity that is of central importance to most people's lives. The EEOC regulations instruct that certain factors must be considered in determining whether an individual is disabled, such as: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and, 3) the permanent or expected long-term impact of the impairment. *See* 29 CFR § 1630.2(j); *see also Williamson v. International Paper, Co.*, 85 F. Supp. 2d at 1190 (S.D. Ala. 1999). In the present case, Davis is merely attempting to characterize a medical condition that is

10

commonly suffered by millions of Americans as a disability. To characterize such a common malady as hemorrhoids, even severe hemorrhoids, as a disability would thwart the purpose of the ADA.

Guffin testified that he expected Davis to make a full recovery. After her follow up visit on June 8, 1998, Davis' next visit was not until November 4, 1998. Guffin placed no restrictions or limitations on Davis' ability to perform her job duties as an office manager. Davis has not met the first element of her *prima facie* case. Not having proven that she is disabled within the meaning of the ADA there is no need to go further in the analysis.

### Retaliation

Davis' claim of retaliation fails as well. Davis has not shown that she has exhausted her administrative remedies. The alleged retaliation that Davis complains of occurred while she was employed and prior to the filing of her EEOC charge. Accordingly, because Davis failed to include her retaliation claims in her EEOC charge, her claim fails for lack of exhaustion of her administrative remedies. Davis did not check the box for "retaliation" under "Cause of Discrimination Based On" even though she marked the boxes for "age," "race," and "disability." Neither did Davis state that she felt that she had been retaliated against in the text of her charge. Davis' retaliation claim fails for lack of exhaustion of her administrative

11

remedies.

Assuming *arguendo* that Davis did exhaust her administrative remedies, she nevertheless has not established a *prima facie* case of retaliation. In order to establish a *prima facie* case of retaliation under the ADA, Davis must show: 1) statutorily protected expression; 2) adverse employment action; and, 3) a causal link between the protected expression and the adverse action. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Prior to her EEOC charge, Davis did not engage in protected expression. Davis says that when she asked BellSouth for special accommodations and her requests were denied, she was engaging in statutorily protected activity. However, Davis did not file a complaint or otherwise inform BellSouth that she was disabled or that she felt that she was disabled. Davis simple assumes that any denial of her requests for medical leave constitutes retaliation. The court in *Standard* held that a plaintiff cannot establish the first element of a *prima facie* case unless there is an objective basis upon which to conclude that the plaintiff was actually disabled. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1329 (11th Cir. 1999). Davis never presented BellSouth with any restrictions from her treating physician or any documentation of her alleged disability. Davis did request time-off and a flexible work schedule, but only after BellSouth had repeatedly

12

disciplined her for poor performance, and Davis was facing termination.

## Conclusion

For the foregoing reasons summary judgment for BellSouth Mobility, LLC will be granted. A separate and appropriate order will be entered.

DONE this 1st day of November, 2002.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE